UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| FRIENDS OF THE BOUNDARY MOUNTAINS, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | 1:12-cv-00357-GZS |
| U.S. ARMY CORPS OF ENGINEERS, *et als.*, | ) ) ) | |
| Defendants, | ) ) | |
| *and* | ) ) | |
| TRANSCANADA MAINE WIND DEVELOPMENT INC., | ) ) ) | |
| Intervenor-Defendant. | ) ) | |

## RECOMMENDED DECISION ON CROSS-MOTIONS
## FOR SUMMARY JUDGMENT

In this action, Plaintiff Friends of the Boundary Mountains seeks to "enjoin the grant of a

permit" (Complaint ¶ 1) that Defendants the Army Corps of Engineers, Army Corps Lt. General

Thomas P. Bostick, and Army Corps Senior Project Manager Jay Clement, issued to Intervenor-

Defendant TransCanada pursuant to Defendants' authority under section 404 of the Clean Water

Act, 33 U.S.C. § 1344, which governs "permits for dredged or fill material." The matter is before

the Court on Plaintiff's Motion for Summary Judgment (ECF No. 31), Defendants' Opposition

and Cross-Motion (ECF No. 32), and Intervenor-Defendant's Cross-Motion and Opposition to

Plaintiff's Motion (ECF No. 36).

Following a review of the administrative record, and after consideration of the parties'

arguments, as explained below, the recommendation is that the Court uphold the administrative

decision, deny Plaintiff's Motion for Summary Judgment, grant Defendants' Cross-Motion for Judgment, and grant Intervenor-Defendant's Cross-Motion for Summary Judgment.

BACKGROUND [1]

On February 10, 2010, Intervenor-Defendant filed an application with the Army Corps of Engineers seeking authorization to disturb wetlands and vernal pools in the Kibby Stream watershed (upper reaches of the Dead River watershed) in connection with the construction of the Kibby Expansion Wind Power Project, located in Kibby and Chain of Ponds Townships, Maine. (R. 1:78, 3:1-3, 3:358-66.)  As originally proposed, the Project contemplated the installation of fifteen 3 megawatt wind turbine generators and "associated elements" adjacent to and to the west of the existing, 132 megawatt Kibby Project. (R. 3:358.)  The Project also included construction of new ridgeline roads and a new substation.  Although the Project would use existing access roads, the plans included the construction of new access roads on Sisk Mountain.  (R. 3:360.)

On March 8, 2010, Defendant Clement notified Intervenor-Defendant by letter that the application form was complete, but that the Army Corps of Engineers needed additional information in order to review the application.  (R. 2:1.)  In addition to requesting further information, Defendant Clement requested that Intervenor-Defendant notify the Corps of any proceedings that might be held before the Maine Land Use Planning Commission, formerly known as the Maine Land Use Regulatory Commission, "so that we can attend if possible."  (R. 2:3.)  Defendant Clement noted that attendance by the Corps at any such proceedings "may allow us to avoid a similar Corps meeting/hearing later in the process."  (R. 2:3.)

---

[1] The administrative record is in eight volumes and is found on two compact disks filed on March 14, 2013. Defendants have certified and indexed the record in related filings.  (ECF No. 15.)  On August 28, 2013, the Court denied Plaintiff's Motion for Consideration of Evidence Not in the Record.  (ECF No. 25.)

Intervenor-Defendant submitted a revised Grid Scale Wind Energy Development Application to the Land Use Planning Commission in December 2009. (R. 7:10.) The application's introduction outlined the Project's scope. (R. 7:31-33.) The application discussed, among other things, avian and bat monitoring conducted by Intervenor-Defendant following consultation with the Maine Department of Inland Fisheries and Wildlife (MDIFW) and the U.S. Fish and Wildlife Service (FWS). Intervenor-Defendant also relied on a collection of studies and surveys in support of its application, including rare raptor nesting surveys, spring and fall daytime surveys of migrating raptors, spring and fall nighttime radar surveys of bird migration, and summertime breeding bird surveys conducted on Sisk Mountain. (R. 7:79-146.) In the application, Intervenor-Defendant also represented that it would conduct post-construction monitoring based on ongoing discussions with MDIFW and FWS. (R. 7:79-146.)

On May 11, 2011, when the proposed project was still a 15-turbine project, FWS wrote to Intervenor-Defendant concerning Intervenor-Defendant's report titled *Eagle Use in the Proposed Kibby Expansion Wind Power Project Area: Impact Assessment and Decision on Take Permit*. (R. 5:14 (Eagle Use report); R. 5:56 (FWS letter).) In the letter, FWS provided Intervenor-Defendant with some information, and expressed its concerns about the Project. More specifically, FWS noted that while the mountains of western Maine are "of particular importance to golden eagles" based on historic nesting habitat and location within a primary migration corridor, its "best information suggests golden eagles were recently extirpated in Maine," largely due to the lasting impacts of environmental contaminants like DDT and DDE. (R. 5:56.) FWS also identified known golden eagle eyries within two to ten miles of the Project site and discussed historic knowledge of a radio-tagged, female golden eagle named "Virgil Cain," which was observed in the vicinity of

the project in 2009 and 2010 and was known to be back in Maine in the spring of 2011, though her movements showed "no sign of territoriality." (R. 5:58.)

FWS also stated that although the degree of deterrence that wind projects place on golden eagle nesting habits is unknown, such projects may "introduce a significant source of mortality to golden eagles and their young." (R. 5:58.) FWS advised that it recently authored a new (April 2011) Draft Eagle Conservation Plan Guidance, which "provides detailed information on methods for data collection, risk assessment, examples of appropriate avoidance and minimization measures and Advanced Conservation Practices . . . for wind projects." The Guidance "encourage[d] all wind applicants in western Maine to avoid take of golden eagles by using the tiered approach in the guidance: siting wind projects in appropriate locations to minimize risk, gathering adequate information to quantitatively model risk to golden eagles, and developing contingencies for avoiding, minimizing, and mitigating take of bald and golden eagles." (R. 5:63.)

FWS informed Intervenor-Defendant that its "currently provided" information was insufficient "to accurately assess risk to eagles at the project site," and further advised that in its view, the Project generated "moderate to high risk of take of golden eagles." (R. 5:63.) FWS also sought "an Avian and Bat Protection Plan and/or Eagle Conservation Plan that [would] identify how uncertainty will be addressed, avoidance and minimization measures, post-construction surveys and research, and an adaptive management framework for addressing uncertainty." (R. 5:63.) FWS further stated that before it provided comments to the Army Corp of Engineers, it wished to discuss multiple issues with Intervenor-Defendant, including, but not limited to, the development of an Eagle Conservation Plan, additional surveys, contributions to ongoing telemetry studies, measures to reduce the project's footprint and rapidly reforest ridge top openings, measures to eliminate electrocution risk to migrating birds, and the development of post-

construction mortality studies. (R. 5:64.) In concluding the letter, FWS asserted that compliance with its Wind Energy Guidelines would be "evidence of due care with respect to avoiding, minimizing, and mitigating adverse impacts to migratory birds." (R. 5:65.)

As part of the Maine Land Use Planning Commission's review process, the Commission solicited input from the Maine Department of Inland Fisheries and Wildlife and other state agencies. (R. 2:143, 176-78.) Most notably, MDIFW evaluated the project's impact on the Bicknell's thrush habitat. The Bicknell's thrush is known to prefer a subalpine forest habitat. (R. 7:1594-95.) MDIFW expressed concern about the proposed location of turbine 11 and its access road, which would have bisected a known, occupied habitat. (R. 7:1595.)

After receiving the information from MDIFW, FWS, and other feedback[2] on the project, Intervenor-Defendant twice amended its proposal. In its first adjustment, Intervenor-Defendant moved turbine 11 to reduce the impact on the subalpine forest habitat favored by the Bicknell's thrush. (R. 2:170.) The second adjustment, made in August 2010, reduced the number of turbines from 15 to 11. (R. 2:271-284, 7:1532, 7:1535-43.) This adjustment also significantly reduced the impact of the Project on the subalpine forest habitat preferred by the Bicknell's thrush. (R. 7:1594-95.) MDIFW reviewed favorably these changes in the proposal, did not object to the Commission's issuance of the development permit based on Maine regulations and policies,[3] concluded that additional pre-construction surveys were not needed, and requested a detailed post-construction monitoring plan to evaluate impacts on the Bicknell's thrush. (R. 7:1595, 1611.)

---

[2] In July 2010, the Commission considered the 15-turbine proposal and "directed staff to draft a decision document denying" that proposal, but prior to completion of the decision, the record was reopened to allow Intervenor-Defendant to submit a revised proposal for 11 turbines. (R. 7:1659-60.) Plaintiff and other interested parties were provided with opportunity to review and comment on the revised proposal. (R. 7:1660.)

[3] The Commission indicated in its decision that MDIFW noted that "[c]onsiderations relative to federal law (Migratory Bird Treaty Act, U.S. Endangered Species Act, or Bald Eagle – Golden Eagle Protection Act) are under the jurisdiction of the U.S. Fish and Wildlife Service." (R. 7:1611.)

On January 5, 2011, the Commission issued its decision and granted Intervenor-Defendant's application for a development permit. (R. 7:1566-1646 (Decision), 7:1647-1657 (Appendix I), 7:1658-1660 (Appendix II).) The Commission issued its permit in due course. (R. 2:236-253.) As part of its review, the Commission convened public hearings and gathered testimony, both oral and written, and other evidence from multiple stakeholders, including Plaintiff. (*E.g.*, R. 7:1604-5, 1612, 1613, 1658-59.)

The Army Corps permitting process continued after the Commission granted the development permit. During the Corps' permit review process, an Army Corps representative attended the Commission's public hearing, and the Corps also gathered evidence and argument from interested parties, including Plaintiff. (R. 1:81, 2:4-5, 2:94-100.) The Army Corps issued its permit decision on or about September 27, 2012. (R. 1:1-10.) The permit contains several special conditions, including that Intervenor-Defendant implement all terms and conditions of the Land Use Planning Commission's permit, conduct certain post-construction eagle surveys, inspect the premises weekly for eagle mortality, construct transmission lines to standards that reduce the risk of electrocution to raptors, and remove all animal carcasses larger than a crow to prevent eagles and other raptors from scavenging in the vicinity of the wind farm. (R. 1:9.) In support of the permit's issuance, the Corps also authored a Memorandum for Record in which it outlined its environmental assessment pursuant to section 404(b)(1) of the Clean Water Act. (R. 1:73-110.)

## DISCUSSION

Plaintiff's complaint recites three counts. In Count I, Plaintiff asserts a claim pursuant to the Clean Water Act. (Complaint ¶¶ 3, 17-30.) In Count II, Plaintiff asserts a claim for the violation of "the Migratory Bird Act." (*Id.* ¶¶ 31-38.) In Count III, Plaintiff asserts a claim for the violation of the Bald and Golden Eagle Protection Act. (*Id.* ¶¶ 39-46.)

More specifically, Plaintiff alleges that Defendants, in issuing the permit for the Kibby Expansion Wind Power Project (the Project), failed to comply with the Clean Water Act; failed to require an independent biological assessment related to eagles and the Bicknell's thrush; failed to discuss adequately the Project's impact on eagles and the Bicknell's thrush; authorized a project that will lead to the "take" of the eagles and various migratory birds, and that will result in the destruction of the Bicknell's thrush habitat; and failed to require that Intervenor-Defendant obtain a migratory bird or eagle take permit from IFW. (*Id.* ¶¶ 2, 27, 29, 30, 37, 38, 45, 46.) In its jurisdictional recitals, Plaintiff concedes that there is no citizen suit provision in either the Migratory Bird Treaty Act or the Eagle Protection Act, but maintains that a claim for judicial review is proper under the Administrative Procedures Act. (*Id.* ¶ 3.)

## A.     Summary Judgment Standard

The parties seek a judicial resolution to their dispute through cross-motions for summary judgment. To succeed on a motion for summary judgment, a party must establish "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Cross-motions for summary judgment do not alter the basic Rule 56 standard, but rather simply require [the Court] to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." *Adria Int'l Grp., Inc. v. Ferre Dev., Inc.*, 241 F.3d 103, 107 (1st Cir. 2001).

As discussed below, Plaintiff's sole actionable claim is its request for judicial review of final administrative action in accordance with the Administrative Procedures Act (APA). In the context of a request for judicial review of final administrative action under the APA, the Court must "review the whole record or those parts of it cited by a party," 5 U.S.C. § 706, but it does not reassess evidentiary disputes in the light most favorable to the non-movant. Rather, because the

APA permits the Court to set aside administrative action "only if that action is arbitrary, capricious, or otherwise contrary to law," and requires the Court to presume that agency action is valid and afford "great deference to agency decisionmaking," the scope of review is narrow. *Associated Fisheries of Maine, Inc. v. Daley*, 127 F.3d 104, 109 (1st Cir. 1997) (citing 5 U.S.C. § 706). In this context, the Court may determine only whether Defendants' permitting decision was statutorily authorized, reasoned, and supported by substantial evidence on the record. *Id.*[4]

**B.      The Clean Water Act (Count I)**

Congress enacted the Clean Water Act (CWA) with the objective of restoring and maintaining "the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To achieve that end, in Subchapter III of the CWA, Congress sought to establish water quality standards for and limitations on the discharge of pollutants. *Id.* §§ 1311-1330. "Discharge of pollutants" means "any addition of any pollutant to navigable waters from any point source." *Id.* § 1362(12). "Pollutants" is defined broadly to include "dredged spoil," rock and sand, and other substances, subject to certain exceptions. *Id.* § 1362(6). The CWA defines navigable waters as the "waters of the United States, including the territorial seas." *Id.* § 1362(7). The parties agree that the wetlands at issue in this case are "navigable waters" for purposes of the CWA.

The CWA authorizes "any citizen [to] commence a civil action on his own behalf" against, among others, the United States and any other governmental agency "alleged to be in violation of (A) an effluent standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation." 33 U.S.C. § 1365(a). However, "no action may be commenced . . . prior to sixty days after the plaintiff has given notice of the alleged violation (i) to the Administrator, (ii) to the State in which the alleged violation occurs, and (iii) to

---

[4] The Court previously denied Plaintiff's request to supplement the record based on the same standard of review related here. (Order on Plaintiff's Motion for Consideration of Evidence Not in the Record, ECF No. 25.)

any alleged violator of the standard, limitation, or order." 33 U.S.C. § 1365(b)(1)(A). By regulation, the notice "shall include sufficient information to permit the recipient to identify the specific standard, limitation, or order alleged to have been violated, the activity alleged to constitute a violation, the person or persons responsible for the alleged violation, the location of the alleged violation, the date or dates of such violation, and the full name, address, and telephone number of the person giving notice." 40 C.F.R. § 135.3(a).

Plaintiff has the burden of establishing that the Court has jurisdiction to consider Plaintiff's CWA claim. *Johansen v. United States*, 506 F.3d 65, 68 (1st Cir. 2007). Defendants argue that because Plaintiff's allegations are not related to an effluent standard, Plaintiff's alleged CWA claim is not within the parameters of the citizen suit authorization. Additionally, Defendants maintain that Plaintiff failed to comply with the pre-suit notification requirement, which failure generates a jurisdictional bar to the action. (Federal Defendants' Opposition and Cross-Motion at 10-11, ECF No. 32-1; *see also* Intervenor-Defendant's Cross-Motion and Opposition at 15, ECF No. 36-1.)

Plaintiff did not respond to Defendants' contention that Plaintiff cannot maintain an individual claim under the CWA. Instead, Plaintiff's response regarding the CWA focuses on Plaintiff's appeal under the Administrative Procedures Act. (Plaintiff's Opposition and Reply at 1-6, ECF No. 40.)

The record contains no evidence upon which a fact finder could reasonably conclude that Intervenor-Defendant or any other Defendant has violated a CWA effluent standard or limitation, or that Intervenor-Defendant has violated an order issued by the Administrator of the EPA or the State of Maine concerning such a standard or limitation. Furthermore, section 1365 does not authorize a citizen suit against the Corps of Engineers based on a theory of "wrongful issuance"

of a section 404 permit.  *Hill v. Boy*, 144 F.3d 1446, 1449 n.7 (11th Cir. 1998); *Holy Cross Neighborhood Ass'n v. U.S. Army Corps of Eng'rs*, 774 F. Supp. 2d 806, 814-15 (E.D. La. 2011); *Stewart v. Potts*, 983 F. Supp. 678, 682 (S.D. Tex. 1997); *Coeur D'Alene Lake v. Kiebert*, 790 F. Supp. 998, 1008 (D. Idaho 1992).  Finally, the record is devoid of any evidence from which one could conclude that Plaintiff complied with the 60-day notice requirement.  Accordingly, Plaintiff cannot prevail on an individual claim under the CWA.

## C.  The Migratory Bird Treaty Act (Count II)

"In 1916, the United States and Great Britain (acting for Canada) negotiated a treaty to protect migratory birds[,] ... whose pilgrimages traverse international borders.  To effectuate this commitment, Congress enacted the [Migratory Bird Treaty Act] in 1918."[5] *United States v. Pitrone,* 115 F.3d 1, 2 (1st Cir. 1997) (internal citations omitted).  The MBTA prohibits the killing or taking of any migratory bird unless and except as permitted by regulations promulgated pursuant to the MBTA by the Secretary of the Interior.  16 U.S.C. § 703(a).  The MBTA is a criminal statute enforced and administered by the Department of the Interior's FWS.  *Id.* §§ 706, 707; *United States v. Zak*, 486 F. Supp. 2d 208 (D. Mass. 2007).  Unlike the CWA, the MBTA does not include a citizen suit provision.  Courts, however, under the Administrative Procedures Act, have recognized requests for injunctive relief in actions where an agency is alleged to have acted in violation of the MBTA.  *E.g.*, *City of Sausalito v. O'Neill,* 386 F.3d 1186, 1203–04 (9th Cir. 2004); *Humane Soc. of the U.S. v. Glickman*, 217 F.3d 882, 886 (D.C. Cir. 2000); *cf. Newton Cnty. Wildlife Ass'n v. U.S. Forest Serv.*, 113 F.3d 110, 114 (8th Cir. 1997) (explaining that review depends on whether an agency's administration of the statute at issue involved a violation of obligations imposed by the MBTA).

---

[5]  Subsequently, the United States entered into bilateral treaties with Mexico, Japan, and the former Soviet Union.  *United States v. Zak*, 486 F. Supp. 2d 208, 212 (D. Mass. 2007).

Although courts have permitted claims by private citizens requesting judicial review of final agency action regarding alleged violations of the MBTA and a request that the court "enforce" the MBTA, courts have done so predominantly, if not exclusively, in the context of federal programs that have as their purpose, or directly cause, the taking or killing of migratory birds. *See, e.g., Glickman*, 217 F.3d 882 (D.C. Cir. 2000) (involving Department of Agriculture's "Integrated Good Management Program" designed to kill the Canada goose); *Ctr. for Biological Diversity v. Pirie*, 191 F. Supp. 2d 161, 165 (D. D.C. 2002) (involving military bombing exercises that killed migratory birds), *vacated*, *Ctr. for Biological Diversity v. England*, Nos. 02-5163, 02-5180, 2003 WL 179848 (D.C. Cir. Jan. 23, 2003) (per curiam) (indicating mootness caused by amendment of the MBTA).[6] Defendants and Intervenor-Defendant argue that this action cannot proceed against Defendant Army Corps of Engineers because the Corps is not engaged in the challenged development activity, but is simply exercising its Congressionally-delegated power to consider permits for dredging and fill activity. (Defendants' Opposition and Cross-Motion at 4, 24-27;

---

[6] Intervenor-Defendant notes one case, *Sierra Club v. Martin*, 933 F. Supp. 1559 (N.D. Ga. 1996), where a court granted preliminary injunctive relief based on evidence that the U.S. Forest Service violated the MBTA by issuing logging permits as part of a national forest management plan that authorized logging during migratory bird nesting season, which would necessarily result in takes of migratory birds. On appeal, the Eleventh Circuit reversed the *Martin* decision on other grounds. 110 F.3d 1551 (11th Cir. 1997) (holding, categorically, that MBTA does not apply to the federal government). Although Intervenor-Defendant characterizes *Martin* as a permitting case (ECF No. 36-1 at 26 n. 12), it is worth noting that *Martin* involved the Forest Service's direct administration of two national forests, not pure permitting activity.

Supplemental authority offered by Defendant persuasively supports the conclusion that a take permit was not required prior to the Corps' issuance of the Section 404 permit, both in relation to MBTA take permits and Bald and Golden Eagle Protection Act (BGEPA) take permits. *Protect Our Communities Found. v. Jewell*, No. 3:13-cv-575, 2014 WL 1364453, at *20 (S.D. Cal. Mar. 25, 2014) ("[Bureau of Land Management] was not required to obtain permits under the MBTA or the BGEPA prior to granting Tule's right-of-way application. Federal agencies are not required to obtain a permit before acting in a regulatory capacity to authorize activity, such as development of a wind-energy facility, that may incidentally harm protected birds."); *Public Emp. for Envtl. Responsibility v. Beaudreu*, Nos. 1:10-cv-01067, 1:10-cv-01073, 1:10-cv-01079, 2014 WL 985394, at *32 (D. D.C. Mar. 14, 2014) ("[O]n its face, the Migratory Bird Treaty Act does not appear to extend to agency action that only potentially and indirectly could result in the taking of migratory birds. . . . Given the statutory and regulatory text, the Court finds that the [Bureau of Ocean Energy Management] did not violate the Migratory Bird Treaty Act by merely approving a [wind-power] project that, if ultimately constructed, might result in the taking of migratory birds."); *Protect our Communities Found. v. Salazar*, No. 3:12-cv-02211, 2013 WL 5947137, at *19 (S.D. Cal. Nov. 6, 2013) ("Plaintiffs have failed to demonstrate that a permit is required under the MBTA for an unintentional killing of migratory birds.").

Intervenor-Defendant's Cross-Motion and Opposition at 25-29.) As explained below, this argument is persuasive.

In this case, Plaintiff requests review of a discretionary permitting decision by Defendant Corps of Engineers, made pursuant to the CWA, because Plaintiff foresees that Intervenor-Defendant's resulting construction activity and eventual turbine operation could result in the incidental take of migratory birds. The relationship between the Corps' regulatory permitting activity and any potential harm to migratory birds appears to be too attenuated to support a direct action against the Corps to enforce the MBTA's prohibition on "takes." The Corps simply exercised its authority to permit dredging and fill activity; the Corps will not construct the project or operate the project when it is completed; and the Corps is not the owner or trustee of the land in question. In addition, the record includes no evidence from which a fact finder could conclude that Intervenor-Defendant could be considered an agent of the Corps.[7]

Given the attenuated relationship between the Corps' permitting process and any potential harm to the migratory birds, not surprisingly, Plaintiff does not offer any persuasive precedent to support its attempt for private-party enforcement of the MBTA. Plaintiff merely asserts that a number of courts have applied the MBTA "in cases that tested the breadth of the law." (Plaintiff's Opposition and Reply at 2, ECF No. 40.) In support of its argument, Plaintiff cites only cases involving *criminal* prosecution of private parties who failed to take measures required by FWS to

---

[7] As explained in section E below, Plaintiff's claim also fails because the Corps has satisfied its obligation under the CWA to consider wildlife values as part of its permit review process, including the wildlife values protected by the MBTA. Whether Intervenor-Defendant's construction activity or wind-power generation activity ever will be conditioned on the issuance of a MBTA take permit is a matter for FWS to consider. The Corps was not required to make an independent assessment of the appropriateness of a MBTA take permit in connection with its review of a CWA section 404 permit application.

prevent the take of migratory birds.  (*Id.*, citing *United States v. Apollo Energies, Inc.*, 611 F.3d 679 (10th Cir. 2010), and *United States v. FMC Corp.*, 572 F.2d 902 (2d Cir. 1978).)[8]

Plaintiff nevertheless argues that the Court of Appeals for the District of Columbia recently held "that the MBTA applies to the approval of third-party activity," which, according to Plaintiff, "should be a sufficient answer to the claim of the Government Defendants and the Intervenor that the MBTA does not apply to agency authorization of third-party action." (*Id.* at 3.)  The referenced case, *American Bird Conservancy, Inc. v. Federal Communication Commission,* involved an appeal from an FCC order that was directly reviewable by the D.C. Circuit Court of Appeals.  On the plaintiff's petition requesting certain agency action, the Court found no fault with the FCC's failure to address the MBTA because the FCC was separately engaged in an inquiry into the effects of telecommunications towers on migratory birds in another, nationwide proceeding.  516 F.3d 1027, 1029 (D.C. Cir. 2008) (per curiam) (2-1) (concluding that the FCC acted reasonably in deferring consideration of this issue);  *see also* In the Matter of Petition by Forest Conservation Council, American Bird Conservancy and Friends of the Earth for National Environmental Policy Act Compliance, FCC 06-44, 2006 WL 985417, at *1 (Apr. 11, 2006).  At best, *American Bird Conservancy* simply demonstrates that MBTA consideration is a germane part of a federal agency's permitting process (a concept discussed in section D below).  The case does not constitute authority for Plaintiff to maintain a separate claim against the Corps for the failure to enforce the MBTA's permit requirement, which permit is administered by a different federal agency, nor is

---

[8] Plaintiff also cites *Pirie* and *Glickman*, which have already been discussed and do not advance Plaintiff's cause.

the case authority for Plaintiff to maintain a separate claim against the Corps for the Corps' failure to obtain its own take permit[9] prior to authorizing dredging and fill activity for the Project.[10]

## D.     The Bald and Golden Eagle Protection Act (Count III)

In 1940, because of the bald eagle's symbolic and threatened status, Congress passed "An Act for the Protection of the Bald Eagle." Act of June 8, 1940, c. 278, § 1, 54 Stat. 250. Congress amended the Act in 1962 to extend its protection to golden eagles based on the golden eagles' agricultural usefulness in controlling rodents and their threatened status. Act of October 24, 1962, Pub. L. No. 87-884, 76 Stat. 1246. The resulting Bald and Golden Eagle Protection Act (BGEPA) criminalizes, *inter alia*, the unauthorized killing, possession, and sale of bald eagles and golden eagles, with knowledge or with wanton disregard. 16 U.S.C. § 668(a). The BGEPA also imposes civil penalties when eagles are taken without a permit, which permits may be issued by the Secretary of the Department of the Interior only in limited circumstances. *Id.* §§ 668(b), 668a.

As defined in the BGEPA, a "take" of an eagle includes not only pursuit, shooting, shooting at, poisoning and similar attempts to kill, but also disturbing an eagle. *Id.* § 668c. Through regulation, the FWS has expanded on the concept of what it means to "disturb" an eagle.

> Disturb means to agitate or bother a bald or golden eagle to a degree that causes, or is likely to cause, based on the best scientific information available, (1) injury to an eagle, (2) a decrease in its productivity, by substantially interfering with normal breeding, feeding, or sheltering behavior, or (3) nest abandonment, by substantially interfering with normal breeding, feeding, or sheltering behavior.

---

[9]  See Plaintiff's Opposition and Reply at 6 n.6.

[10]  Plaintiff also cites *Defenders of Wildlife v. Administrator, EPA*, 882 F.2d 1294 (8th Cir. 1989). The case focused on a challenge to an EPA determination made pursuant to the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA), which provides the EPA with authority to register or de-register pesticides. The case involved judicial review of administrative action concerning a matter squarely within the EPA's decision-making authority and also arose pursuant to a citizen-suit provision found in the Endangered Species Act (ESA). *Id.* at 1298. It does not advance, or have any relevance to, Plaintiff's position that Plaintiff has an independent action against the Army Corps of Engineers for violation of, or failure to enforce, an FWS permit program as a precondition to a CWA section 404 permit decision. At most, it suggests that review is available pursuant to the APA. *Id.* at 1298-99. To the extent the Eighth Circuit entertained an independent cause outside of the FIFRA review claim, it did so exclusively under the ESA and specifically held that no independent action was available under either the MBTA or the BGEPA. *Id.* at 1299-1302.

50 C.F.R. § 22.3. Pursuant to the same regulatory scheme, FWS may issue a permit for the "take" of bald eagles and golden eagles under specific circumstances. Those circumstances must be:

> compatible with the preservation of the bald eagle and the golden eagle; necessary to protect an interest in a particular locality; associated with but not the purpose of the activity; and

> (1) For individual instances of take: the take cannot practicably be avoided; or

> (2) For programmatic take: the take is unavoidable even though advanced conservation practices are being implemented.

50 C.F.R. § 22.26(a). FWS has promulgated a rule that with respect to golden eagles, FWS will not issue any take permits east of 100 degrees west longitude, "unless necessary to alleviate an immediate safety emergency." Eagle Permits; Take Necessary To Protect Interests in Particular Localities, 74 FR 46836-01, 46840 (Sept. 11, 2009).

Like the MBTA, the BGEPA does not include a citizen suit provision. Plaintiff, therefore, cannot pursue an individual claim based on an alleged "violation" of the BGEPA by the Corps when the Corps merely acts pursuant to its authority under section 404 of the CWA to issue a permit for dredging and fill activity. The BGEPA incidental take permit matter is a matter for FWS to monitor through its independent regulatory authority.[11]

## E.    Administrative Procedures Act

### a.    Jurisdiction

Plaintiff also seeks judicial review, under the APA, of the Corps' permitting decision. While Defendant Army Corps of Engineers apparently maintains that the only available claim that

---

[11] As discussed in section E below, Plaintiff's claim also fails because the Corps has satisfied its obligation under the CWA to consider wildlife values as part of its permit review process, including the wildlife values protected by the BGEPA.

a citizen may pursue following a section 404 permitting decision by the Corps is a claim under 33 U.S.C. § 1365(a) for violation of the permit's conditions, courts have commonly reviewed section 404 permitting decisions under the APA. *See, e.g., Ohio Valley Envtl. Coalition v. Aracoma Coal Co.*, 556 F.3d 177, 189 (4th Cir. 2009); *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 417 F.3d 1272, 1278-81 (D.C. Cir. 2005); *Preserve Endangered Areas of Cobb's History, Inc. v. U.S. Army Corps of Eng'rs,* 87 F.3d 1242, 1246 (11th Cir. 1996). This is consistent with the plain language of the APA, which provides in pertinent part: "A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. A fair reading of the CWA citizen-suit provision, 33 U.S.C. § 1365, suggests that it expands upon the right of the citizenry to seek judicial relief under the APA, not that it impliedly forbids APA claims. The Court thus has jurisdiction to address Plaintiff's APA claim for judicial review of Defendants' permitting decision.

        b.     *APA standard of review*

Under the APA, a reviewing court must "decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." Based on its review of "the whole record or those parts of it cited by a party," the court must "hold unlawful and set aside agency action, findings, and conclusions found to be," for present purposes, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "unsupported by substantial evidence." 5 U.S.C.A. § 706(2). Judicial review in this context "is narrow" and affords "great deference" to agency decision making. *Daley*, 127 F.3d at 109. The task of the reviewing court is limited to determining whether the decision to issue the CWA section 404 permit "was consonant with [the Corps'] statutory powers, reasoned, and

supported by substantial evidence in the record." *Id.* Policy choices that do not fall outside these broad parameters must be upheld because it is not within the reviewing court's authority to "substitute its judgment" in place of the agency's judgment. *Id.*

        *c.*     *Section 404 Guidelines and the Corps' General Regulatory Policies*

Discharge of non-excepted pollutants into U.S. waters is illegal in the absence of a permit. 33 U.S.C. § 1311(a). According to Section 404 of the CWA, the Secretary of the Army, acting through its Chief of Engineers can issue permits for the discharge of dredged or fill material into navigable waters. *Id.* § 1344(a), (d). Permit issuance is subject to "Section 404 Guidelines" developed by the Administrator of the Environmental Protection Agency (EPA), in conjunction with the Secretary of the Army. *Town of Norfolk v. U.S. Army Corps of Eng'rs*, 968 F.2d 1438, 1445 (1st Cir. 1992); 33 U.S.C. § 1344(b); Section 404(b)(1) Guidelines for Specification or Disposal Sites for Dredged or Fill Material, 40 C.F.R. Part 230.

The 404 Guidelines focus primarily on aquatic ecosystems and water quality, 40 C.F.R. § 230.10, two factors that are not relevant to Plaintiff's action. The Guidelines, however, contemplate the Corps' consideration of the impact of specified dredging or filling activity on, among other things, "species listed as endangered or threatened under the Endangered Species Act of 1973, as amended," including whether the activity "results in the likelihood of the destruction or adverse modification of a habitat which is determined by the Secretary of Interior or Commerce, as appropriate, to be a critical habitat under the Endangered Species Act of 1973, as amended." 40 C.F.R. § 230.10(b).

The Army Corps also maintains its own policies regarding the section 404 permitting process. General Regulatory Policies, 33 C.F.R. Part 320. The policies provide: "If the district engineer determines that the proposed discharge would comply with the 404(b)(1) guidelines, he

will grant the permit unless issuance would be contrary to the public interest." 33 C.F.R. § 323.6(a). Review of applications thus requires a public interest review. *Id.* § 320.4(a).

The review involves "an evaluation of the probable impacts, including cumulative impacts, of the proposed activity and its intended use on the public interest" and "should reflect the national concern for both protection and utilization of important resources." *Id.* § 320.4(a)(1). An impact assessment requires "a careful weighing of all those factors which become relevant in each particular case," and the benefits of a proposal must be balanced against "reasonably foreseeable detriments." *Id.* The policies establish a non-exclusive list of factors:

> All factors which may be relevant to the proposal must be considered including the cumulative effects thereof: among those are conservation, economics, aesthetics, general environmental concerns, wetlands, historic properties, fish and wildlife values, flood hazards, floodplain values, land use, navigation, shore erosion and accretion, recreation, water supply and conservation, water quality, energy needs, safety, food and fiber production, mineral needs, considerations of property ownership and, in general, the needs and welfare of the people.

*Id.* The weight attributed to each factor "is determined by its importance and relevance to the particular proposal" and "how much consideration it deserves will vary with each proposal." 33 C.F.R. § 320.4(a)(3). "Full consideration" is to be given "to all comments, including those of federal, state, and local agencies, and other experts on matters within their expertise." *Id.*

With respect to fish and wildlife values, Corps engineers must "consult with" the FWS and "the head of the agency responsible for fish and wildlife for the state in which work is to be performed, with a view to the conservation of wildlife resources by prevention of their direct and indirect loss and damage due to the activity proposed in a permit application." *Id.* § 320.4(c). "The Army will give full consideration to the views of those agencies on fish and wildlife matters in deciding on the issuance, denial, or conditioning of individual or general permits." *Id.*

In addition to this regulatory framework, the review process requires that the Corps consider multiple, related federal statutes, including the Endangered Species Act, 16 U.S.C. §§ 1531 *et seq.*, when implicated, and the National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq.*, which provides that all federal agencies must "insure that presently unquantified environmental amenities and values may be given appropriate consideration in decision-making along with economic and technical considerations." *See* 33 C.F.R. § 320.3(d), (i).[12]

### d. Golden eagles

In support of its request for summary judgment, Plaintiff argues that Defendants abused their discretion and acted arbitrarily because they relied heavily on the "Eagle Use" report commissioned by Intervenor-Defendant and criticized by FWS. (Plaintiff's Motion for Summary Judgment at 7-8, ECF No. 31-1.) Plaintiff contends that the Eagle Use report erroneously concluded that a take permit was not needed to complete construction of the Project in the designated location. Plaintiff argues that the report erred when it concluded that the site lacks evidence of a golden eagle nest, that the habitat is not conducive to eagle foraging, and that there are no nesting females in the Project's vicinity. (*Id.* at 8.) Plaintiff maintains that the more persuasive evidence established that the Project would increase the presence of eagles at the location. Among the evidence cited by Plaintiff is the view expressed by Jim Wiegand, Vice President of Save the Eagle International, who opined that wind development will encourage, rather than discourage, eagle foraging in the region. (*Id.* at 10, citing R. 5:96.)

The record establishes that the FWS was critical of Intervenor-Defendant's attempt to rely exclusively on the Eagle Use report to satisfy the concern about golden eagle mortality. Subsequently, the FWS articulated additional conditions to the issuance of the permit that would

---

[12] Plaintiff's complaint and filings make no mention of the NEPA and do not advance a claim for violation of the ESA.

address its concerns. Defendants included the requirements as conditions of the permit: the development of an Eagle Conservation Plan prepared in accordance with the FWS's Eagle Conservation Plan Guidance for wind power projects, the performance of additional eagle surveys in accordance with methods prescribed in the Guidance, construction of transmission lines to reduce the risk of electrocution to raptors, and removal of animal carcasses to prevent eagles from scavenging in the vicinity of the Project during its operation. (Permit Special Conditions, R. 1:8-9.) Contrary to Plaintiff's argument, this record evidence cannot support and does not support the conclusion that the Corps' permit decision was arbitrary or capricious.[13]

The Corps acknowledged that the Sisk Mountain has historic association with golden eagle nesting activity (outside the immediate Project vicinity) and is within an important migration corridor. To address this concern, with one exception, the Corps imposed all of the recommended conditions that were generated by the efforts of Intervenor-Defendant and the FWS to develop conservation measures. (R. 1:83, 99.) The sole recommendation that the Corps did not require was certain "research funding" to balance the competing interests at stake in the Project. Neither the FWS's conditions, nor the Corps' acceptance of the same, reflects arbitrary decision-making or a violation of any applicable federal law.

Finally, Plaintiff argues that nothing short of a biological assessment could satisfy the agencies' obligation to protect golden eagles. (Plaintiff's Motion for Summary Judgment at 9.) In support of this position, Plaintiff points to the Endangered Species Act (ESA), which requires "interagency cooperation" before a federal agency, *inter alia*, authorizes action that "jeopardize[s]

---

[13] Plaintiff evidently also contends that the Corps' decision is unfounded given the FWS's Eagle Conservation Plan Guidance, FWS's understanding that wind power projects pose a risk to eagles and other raptors, and FWS's decision to permit Intervenor-Defendant to commence construction before the completion of additional eagle surveys. FWS is not a party to this action and, therefore, Plaintiff's concerns about FWS's actions are not subject to judicial review in this proceeding. Moreover, Defendants did not have to acquire or require a golden eagle take permit in order to grant the section 404 permit.

the continued existence of any endangered species or threatened species or result[s] in the destruction or adverse modification of [critical] habitat of such species." 16 U.S.C. § 1536(a)(2). "To facilitate compliance" with the requirement for interagency cooperation, federal agencies are required to request of the Secretary of the Interior "whether any species which is listed or proposed to be listed may be present in the area," and if the Secretary answers that "such species may be present," the agency "shall conduct a biological assessment for the purpose of identifying any endangered species or threatened species which is likely to be affected by such action." *Id.* § 1536(c)(1). Plaintiff, however, does not cite any evidence that suggests that a species either listed as endangered or proposed for listing as endangered is likely to be affected by Defendants' permit to discharge dredged and fill material at the Project site. Plaintiff thus fails to establish that approval of a permit to discharge dredged and fill material at the Project site required a biological assessment under the ESA of either golden eagles or the Bicknell's thrush, or that the Corps' failure to require a biological assessment of either species was an abuse of discretion or contrary to law.[14]

e.    *Bicknell's thrush*

Plaintiff asserts that Defendants disregarded the threat that the Project poses to the Bicknell's thrush, whose preferred habitat will be impacted by the Project. According to Plaintiff, Intervenor-Defendant and FWS "significantly underestimated the amount of habitat loss by erroneously limiting its estimate to those areas mapped as 'core' habitat." (Plaintiff's Motion for Summary Judgment at 14.) Plaintiff contends that Intervenor-Defendant measured the impact footprint based on the use of a 50-foot buffer zone, but that a 250-foot buffer zone is a more reliable

---

[14] Plaintiff complains that the golden eagle is listed as endangered by the State of Maine and that the golden eagle has "fallen through the cracks" because the Maine Land Use Planning Commission did not assure its protection. (Plaintiff's Motion for Summary Judgment at 9 n.4, 13 n.7; *see also* 12 M.R.S. § 12803(3).) However, without commenting on the merit of Plaintiff's concern about the enforcement of any state laws, this federal action is limited to a review of the Corps' decision to issue a CWA section 404 permit pursuant to federal law.

measure of the impact footprint. (*Id.*) Plaintiff notes that despite the amendment of the project to eliminate some turbines, three turbines remain in a "high value breeding Bicknell's thrush habitat," and the turbines will degrade the habitat and create direct risk of bird mortality. (*Id.*) Plaintiff also argues that the high-elevation portion of the habitat (where the wind power facilities would be placed) is "the most ecologically significant part" and represents "the rarest part of this rare community." (*Id.* at 15 n.11.)

In the Memorandum of Record issued with its permit decision, the Corps addressed the evidence of the inherent value of the subalpine forest community as well as that forest community's value as a habitat for the Bicknell's thrush. The record demonstrates that concern for the Project's impact on the subalpine forest habitat was a primary consideration that resulted in significant revision of the Project and a substantial reduction in its scale in order to accommodate wildlife values associated with the Bicknell's thrush. The evidence supports the finding made by the Corps that the Project, as amended, will directly impact approximately 20 acres and indirectly impact approximately 25 acres of the Sisk Mountain subalpine forest habitat—part of a local community of approximately 358 acres—and will leave intact substantial remaining contiguous acres of subalpine forest habitat for the Bicknell's thrush. (R. 2:111-12, 144-145, 152-54; 7:1592-93.) That same evidence establishes that thousands of acres of subalpine forest habitat exist in the State of Maine. The Corps, citing the record developed before the Land Use Planning Commission and recognizing the Commission's "expertise and authority in this matter," concluded, in agreement with the Commission, that the stated degree of impact would not constitute an "undue impact" on the subalpine forest community or the Bicknell's thrush. (R. 1:82.)

Plaintiff contends that the Corps and the FWS "abdicated their responsibility" by deferring in this way to an assessment made by the Commission based on a record presented to the

Commission. (Plaintiff's Motion for Summary Judgment at 16.) Plaintiff maintains that the FWS has primary authority under the MBTA to address this particular concern for the migratory Bicknell's thrush. The record, however, supports the conclusion that the "preferred" Bicknell's thrush habitat is a subset of the overall subalpine forest habitat and that the Project would only directly impact approximately 5 acres of a total 88 acres of local, preferred habitat, with indirect impacts of between 3 and 10 acres. (R. 2:22-23; 7:1593-94.)

In essence, Plaintiff contends that in evaluating the evidence, the Corps assigned insufficient weight to the evidence that Plaintiff maintains demonstrates a significant threat to eagles and other migratory birds. The issue, however, is not whether one could have weighed the evidence differently. The issue is whether the decision is supported by substantial evidence on the record. As explained above, substantial evidence of record supports the Corps' permitting decision, and the decision was not arbitrary or capricious.

## CONCLUSION

For the reasons set forth above, it is recommended that the Court: *grant* Defendant's Cross-Motion for Summary Judgment (ECF Nos. 32/33); *grant* Intervenor-Defendant's Cross-Motion for Summary Judgment (ECF No. 36); and *deny* Plaintiff's Motion for Summary Judgment (ECF No. 31).

## NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within fourteen (14) days of being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ John C. Nivison
U.S. Magistrate Judge

April 23, 2014